UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x
ANGELA ROSA BONILLA ORDOÑEZ,

               Petitioner,

  -against-                           **MEMORANDUM AND ORDER**
                                    Case No. 09-CV-1571 (FB)
CLAUDIO HERNAN SINCHI TACURI,

               Respondent.
-------------------------------------------------------x

*Appearances:*
*For the Petitioner:*                                *For the Respondent:*
TRACY VICTORIA SCHAFFER, ESQ.         GIL SANTAMARINA, ESQ.
MARK SEIDEN, ESQ.                             Santamarina & Associates
Jones Day                                            260 Madison Avenue, 17th Floor
222 East 41st Street                            New York, NY 10016
New York, NY 10017

**BLOCK, Senior District Judge:**

        Pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 24, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, reprinted in 51 Fed. Reg. 10,494 (Mar. 26, 1986) ("the Hague Convention"), implemented by the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq.* (2000), Angela Rosa Bonilla Ordoñez ("Bonilla") has filed a petition against her husband, Claudio Hernan Sinchi Tacuri ("Sinchi"), seeking the return to Ecuador of their three-year-old son, James Hernan Sinchi Bonilla ("James"), who is currently residing with Sinchi in Queens, New York.

        The Court held a hearing that commenced on July 6, 2009. Bonilla's sister Gladys Maria Bonilla Ordoñez ("Gladys") and Bonilla herself testified on Bonilla's behalf via video link from Ecuador.[1] Bonilla's other sister, Gloria Margarita Bonilla Ordoñez ("Gloria"); Sinchi and

---

[1] Bonilla attempted to secure a temporary visa to attend the hearing in person, but her application was denied on account of her prior illegal entry into the United States.

Bonilla's Queens landlord, Juan Ernesto Zumba; Sinchi's mother, Teresa Tacuri; Sinchi's friend, Jose Sinchi (no relation); and Sinchi himself testified in person on Sinchi's behalf. The parties also submitted various documents as exhibits.

In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the following constitutes the Court's findings of fact and conclusions of law. Based on those findings and conclusions, the petition is denied.

## FACTUAL OVERVIEW

Bonilla is a 32-year-old native-born citizen of Ecuador; she is not an American citizen. She currently lives in the city of Tena, Napo Province, Ecuador. Bonilla has three sons. The youngest, James, age 3 – with whom this litigation is concerned – was fathered by Sinchi; James was born in the United States and is an American citizen. Bonilla's two elder sons, ages 14 and 10, have a different father; they are Ecuadorian citizens and currently live with Bonilla in Ecuador.

Sinchi lives in Queens, New York. His age is not in the record. He was born in Ecuador and, since 2004, has been a dual citizen of Ecuador and the United States. He has no children other than James.

Bonilla and Sinchi met in Ecuador in 2001 and became romantically involved. About a month later, Sinchi left Ecuador for the United States. Bonilla came to the United States illegally to live with Sinchi in April of 2002. James was born in the United States on January 6, 2006

At some point during the first part of 2006, Bonilla heard that her two elder sons were being mistreated by their stepmother in Ecuador. Therefore, in August 2006, when James was eight months old, Bonilla and Sinchi, along with James, traveled together to Ecuador to attend to Bonilla's two elder sons. Bonilla and Sinchi also intended to marry while in Ecuador so that Sinchi could sponsor Bonilla and her two elder sons for American citizenship. When they left Queens, they

2

brought with them only two pieces of luggage per person; the remainder of the family's belongings – including James's belongings – was stored in their landlord's garage.

About two weeks after their arrival in Ecuador, Bonilla and Sinchi were married. On September 26, 2006, Sinchi returned alone to the United States; Bonilla remained in Ecuador with James, pursuing custody of her two elder sons and waiting for Sinchi to sponsor her and her two elder sons' citizenship applications. On November 17, 2006, while in the United States, Sinchi initiated the citizenship applications.

In December 2006, Sinchi briefly returned to Ecuador and, in January 2007, with Bonilla's consent, took James, then one year old, back to the United States. Eight months later, in September 2007, Sinchi and James returned to Ecuador. Shortly after Sinchi arrived, he learned that Bonilla had been unfaithful to him and their relationship grew sour. Before then, Sinchi had intended to process the citizenship applications with dispatch; afterwards, he lost interest in doing that. On October 17, 2007, Bonilla was granted full Ecuadorian custody of her two elder sons. Four days later, on October 21, 2007, Sinchi and James returned to New York; James has remained here ever since.

In November 2007, Bonilla's sister Gloria left Ecuador and entered the United States illegally; soon thereafter, Gloria and Sinchi became romantically involved. At some point toward the end of 2007, Bonilla realized that Sinchi could not be relied upon to process and support the citizenship applications for her and her two elder sons. In or about February 2008, Bonilla filed a court proceeding in Ecuador against Sinchi and on March 11, 2008, secured an Ecuadorian judgment ordering Sinchi to "turn over [James] forthwith . . . ." Pet'r's Ex. 8. On April 15, 2009, she filed this action.

## LEGAL STANDARDS

3

The Hague Convention, to which the United States and Ecuador are both signatories,[2] endeavors to "protect children internationally from the harmful effects of their wrongful removal . . . and to establish procedures to ensure their prompt return . . . ." Hague Convention, pmbl. In conducting a Hague Convention proceeding, "the Court must resist the temptation to engage in a custody determination under the traditional 'best interests' test." *Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 403 (E.D.N.Y. 2005); *see also Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) ("[A] United States district court has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim." (citing Hague Convention art. 9)). Thus, "it is not relevant . . . who is the better parent in the long run . . . ." *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000) (citations and quotation marks omitted).

"[I]n order to prevail on a claim under the Hague Convention a petitioner must show that (1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Gitter v. Gitter*, 396 F.3d 124, 130 (2d Cir. 2005). Once these elements are established, "the [Court] shall order the return of the child[,]" Hague Convention art. 12, unless one of the affirmative defenses set forth in Articles 12, 13 and 20 applies.[3]

---

[2]*See* Hague Conference on International Law: Report of the Second Special Commission Meeting to Review the Operation of the Hague Convention on the Civil Aspects of International Child Abduction, 33 I.L.M. 225, 225 (1994).

[3]The five affirmative defenses are: (1) the petition was filed more than a year after the child was wrongfully removed and "the child is now settled in its new environment[,]" Hague Convention art. 12; (2) the petitioner "was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention[,]" *id.* art. 13(a); (3) "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation[,]" *id.* art. 13(b); (4) "the child objects to being returned and has attained an age and degree of

The only element of Bonilla's Hague Convention burden at issue here is whether James "was habitually resident in [Ecuador]" at the time he was removed to the United States on October 21, 2007. *Gitter*, 396 F.3d at 130. "Neither the Hague Convention nor its implementing legislation defines 'habitual residence.'" *Villegas Duran v. Arribada Beaumont*, 534 F.3d 142, 147 (2d Cir. 2008). However, the Second Circuit has counseled as follows:

> First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child.
>
> Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to [a] new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

*Villegas Duran*, 534 F.3d at 147 (quoting *Gitter*, 396 F.3d at 134). The parties' intent is "a question of fact in which the findings of the district court are entitled to deference . . . ." *Gitter*, 396 F.3d at 133.

## APPLICATION

### A. Last Shared Intent

It is undisputed that before Sinchi and Bonilla heard in 2006 that Bonilla's two elder children in Ecuador were being mistreated, both parties intended that James live permanently and be raised in the United States. Sinchi argues that he never changed this intention and, therefore, that the parties' last shared intent was that James live and be raised in the United States.

By contrast, Bonilla argues that the parties' last shared intent was *conditional* – i.e.,

---

maturity at which it is appropriate to take account of its views[,]" *id.* art. 13; and (5) the return of the child "would not be permitted by the fundamental principles . . . relating to the protection of human rights and fundamental freedoms," *id.* art. 20.

that once she and Sinchi decided to travel to Ecuador in August 2006, they "agreed that [James] would stay in Ecuador [*unless and*] *until* [Bonilla] and her two [elder] sons could come to and live in the United States legally." Pet'r's Br. at 5 (emphasis added). In other words, according to Bonilla, Sinchi's securing American citizenship for Bonilla and her two elder sons was an agreed-upon "condition precedent to [James's] living in the United States." *Id.* at 7. Since this condition never came to pass, Bonilla argues that the parties' conditional intent that James be raised in the United States was never triggered and that, under these circumstances, Ecuador is the residence of last shared intent.

*1. Sinchi's Intent*

Sinchi testified that his intention was unconditional that James would be raised in the United States, regardless of whether Bonilla and her two elder sons would ever come to the United States. Specifically, he testified that if Bonilla and her two elder children could not come to the United States legally, "[he] would have lived here [in the United States] with [James] and [he] would have gone [to Ecuador] to visit with [Bonilla,] or [he] would have found another solution to be together" with her.[4] Tr. at 176:22-24.[5] Sinchi also testified that he and Bonilla did *not* have an agreement that James would live indefinitely with Bonilla in Ecuador until the citizenship petitions were successful. *See* Tr. at 185:6-9; Tr. at 209:18-24.

Bonilla asks the Court to discredit this trial testimony because of Sinchi's seemingly contrary testimony at his deposition:

Q: At that point in time, September of 2006, did you agree with

---

[4]In light of Bonilla's testimony that Sinchi had arrranged for her prior illegal entry into the United States in 2002, the Court surmises that the "other solution" of which Sinchi spoke was bringing Bonilla and her children over the border illegally.

[5]Citations to "Tr." refer to the bench trial transcript.

6

> Ms. Bonilla that she'd stay with James in Ecuador until her two sons could also come to the United States?
>
> A: Yes.

Sinchi Dep. at 37:1-18. However, this statement is not necessarily incompatible with Sinchi's trial testimony. Rather, it admits of two interpretations:

> (1) James would maintain his residence in the United States and "stay" in Ecuador *temporarily*, for the amount of time the parties envisioned would be reasonably necessary for Bonilla to gain custody of her sons and for Sinchi to pursue the citizenship petitions. After this reasonable period of time, James would return to the United States to be raised and live permanently, *regardless* of whether the parties were successful in their tasks.
>
> (2) James would abandon his residence in the United States and "stay" in Ecuador *indefinitely*, acquiring a new residence. This state of affairs would persist until such time – if ever – as the parents successfully completed their tasks. Only then – if at all – would James return to the United States.

Only the second interpretation is inconsistent with Sinchi's trial testimony; the first is not.

In examining the "shared intent . . . to fix the child's residence," a court should consider "whether the child's presence at a [new] location is intended to be temporary, rather than permanent." *Gitter*, 396 F.3d at 132. As now-Chief Judge Kozinski of the Ninth Circuit has noted, the mere fact that both parents intended their child to be in a particular place *for a period of time* does not make that place the child's "habitual residence":

> Even [though] the child who goes off to summer camp arguably has a settled purpose to live there continuously for a limited period[, n]o one would seriously contend that the summer camp is the child's habitual residence . . . . The obvious reason why the camper is not regarded as habitually resident is that he already has an established habitual residence elsewhere and his absence from it – even for an entire summer – is no indication that he means to abandon it. . . . [Thus, t]he first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind.

7

> Otherwise, one is not habitually residing; one is away for a temporary absence of long or short duration.

*Mozes v. Mozes*, 239 F.3d 1067, 1075 (9th Cir. 2001) (internal quotation marks and citations omitted).

The Court credits Sinchi's trial testimony and accepts the first interpretation of his deposition testimony – that he intended James's sojourn in Ecuador to be temporary, and never intended that James would abandon the United States as his habitual residence. It is simply implausible that Sinchi, in taking James to Ecuador with only two pieces of luggage, intended James to "abandon the [home] left behind" – the country of James's own citizenship – and acquire a permanent new life in Ecuador. *Mozes*, 239 F.3d at 1075. That Sinchi brought James back to New York for eight months in 2007 merely confirms that he never intended James to abandon the United States as his home during James's time in Ecuador.

Contrary to Bonilla's contention, it is irrelevant that Sinchi may have lost interest in supporting and processing the citizenship applications for her and her two elder sons after he learned of her infidelity; the relevant inquiry is the parties' *contemporaneous* intent "at the latest time their intent was shared." *Villegas Duran*, 534 F.3d at 147.

## 2. *Bonilla's Intent*

Because of her inconsistent testimony, the Court finds Bonilla not credible on the matter of her contemporaneous intent. In her deposition, Bonilla testified that "[her] intention was that if her papers would come out, [she would] be able to return with [her] three children to the United States." Tr. at 60:21-25. This is consistent with a "conditional intent" theory. However, at trial, Bonilla testified that when she, Sinchi and James left for Ecuador, "there was no possibility of [her] coming back," Tr. at 20:12-15, 22, and that "[her] intention [at that time] was to live in

8

Ecuador with James and [her other] two children," Tr. at 53:8-9, and "not to return to live in the United States," Tr. at 53:17-18. Her trial testimony is thus inconsistent with a "conditional intent."[6]

Moreover, three separate witnesses – Bonilla's sister Gloria, the parties' Queens landlord, and Sinchi's mother – testified that Bonilla told them that, should the citizenship plan fail, she intended to bring her two elder sons to the United States illegally – a trip that she had already made once before. The Court credits their testimony and finds that, at the time Bonilla brought James to Ecuador, she intended that he be raised in the United States regardless of whether she and her two elder sons were granted citizenship.

This remained Bonilla's intention until sometime shortly after September 2007, when Sinchi learned that Bonilla had been unfaithful and their relationship grew hostile. Once Bonilla realized that Sinchi may have lost interest in pursuing the citizenship applications, she abandoned her intention to return to the United States to live with Sinchi, and decided that she would prefer to live with her children, including James, in Ecuador. It was only then that her intent diverged from Sinchi's.

### 3. *Conclusion*

In sum, the Court finds that when the parties left for Ecuador both agreed that James

---

[6]Bonilla's credibility is also diminished by her trial testimony that she allowed James to return to the United States temporarily in January 2007 with Sinchi to acquire Ecuadorian-American dual citizenship so that James could "stay and live permanently in Ecuador with [her]." Tr. at 23:13-15. First, this statement is inconsistent with a "conditional intent" theory; moreover, Bonilla could not explain why it was necessary to take James to *the United States* in order to acquire citizenship in *Ecuador* – a proposition that appears illogical on its face. Bonilla's counsel contends that tourists who enter Ecuador with a "Short-Term Visit or Transient Visa" may only stay for six months and must "leave the country of Ecuador to apply for a different Immigration status," Pet. Br. at 10; however, there was no evidence adduced that James entered Ecuador with this visa, as opposed to the more logical "Economic Dependence Visa," which "may be requested by an Ecuadorian citizen for his foreign . . . child[ren]," http://www.ecuador.org/immigrantvisas.htm#economical (last accessed July 23, 2009), and "is valid for an unlimited period," http://www.ecuador.org/visas.htm (last accessed July 23, 2009).

9

would stay in Ecuador *temporarily* for a period of time reasonably necessary for Bonilla to gain custody of her elder two sons and for Sinchi to pursue their United States citizenship. Neither party envisioned James remaining in Ecuador *permanently* under any conditions; rather, both parties intended that, after this reasonable period of time had elapsed, James would return to the United States to be raised, and that the entire family would also come to the United States to live – legally if possible, but illegally if necessary.

At some subsequent time, the parties' marriage fell apart, and Bonilla changed her mind. This change may well have been justified – but the Hague Convention analysis does not turn on *why* the parties' intentions diverged. The Court's duty is simply to determine the place where the parties intended that James be raised "at the last time that their intent was shared." *Villegas Duran*, 534 F.3d at 147. That place, the Court finds, is the United States.

## B. Acclimatization

Determining the parties' last shared intent is not always the end of the habitual-residence analysis, as "the child [may become] acclimatized to [the] new location and thus . . . acquire[] a new habitual residence, notwithstanding any conflict with the parents' latest shared intent." *Villegas Duran*, 534 F.3d at 147; *see Gitter*, 396 F.3d at 134 ("Even when there is no [shared] intent on the part of the parents to abandon the child's prior habitual residence, courts should find a change in habitual residence if the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place." (quoting *Mozes*, 239 F.3d at 1081) (internal quotation marks omitted)).

However, "courts should be 'slow to infer' that the child's acclimatization trumps

the parents' shared intent," lest they "open children to harmful manipulation when one parent seeks to foster residential attachments during what was intended to be a temporary visit." *Id.* (quoting *Mozes*, 239 F.3d at 1079). "The question . . . is not simply whether the child's life in the new country shows some minimal degree of settled purpose, but whether we can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring [the child to live in the place of last shared intent] would now be tantamount to taking the child out of the family and social environment in which its life has developed." *Id.* (quoting *Mozes*, 239 F.3d at 1081) (internal quotation marks omitted); *see also Holder v. Holder*, 392 F.3d 1009, 1019 (9th Cir. 2004) ("[T]he inquiry is . . . whether the children's lives have become firmly rooted in [the country that is not the place of last shared intent]."). Thus, acclimatization may only trump shared intent "[i]n [the] relatively rare circumstances . . . [where] the child's acclimatization to the location abroad [is] so complete that serious harm to the child can be expected to result" if the child were to live in the place of last shared intent. *Gitter*, 396 F.3d at 134.[7]

Here, James had spent sixteen months in the United States at the time Sinchi brought him back to the United States permanently in October 2007; by contrast, James had spent only *eight* months in Ecuador at that time.[8] Moreover, James was less than two years old at the time he was removed to the United States; on account of his tender age, he is presumed not to have formed any

---

[7]As a hypothetical example of a situation where acclimatization would trump intent, the Second Circuit has noted that "a child who has spent fifteen years abroad . . . would predictably suffer severe harm if returned to the state he had experienced only at birth," and would thus be found to have acquired a new habitual residence, "even if the parents intended some day to return [to the place of birth] and did not intend that the child acquire a new habitual residence." *Gitter*, 396 F.3d at 133-34.

[8]The Court is mindful that it would be inappropriate to consider the period of time *after* the alleged wrongful removal in the acclimatization analysis, as this could "reward the [allegedly] abducting parent for the time during which the child was [allegedly] wrongfully retained or removed." Pet. Br. at 12.

11

strong attachments to Ecuador. *See Whiting v. Krassner*, 391 F.3d 540, 548 (3d Cir. 2004) ("[W]here a child is very young it would, under ordinary circumstances, be very difficult for him . . . to have the capability or intention to acquire a separate habitual residence."); *Holder*, 392 F.3d at 1020-21 (noting that the "age [of the child] is relevant to the acclimatization analysis" and finding that the "infant's limited time in Germany [did not] so firmly embed[] his life there that his habitual residence shifted overseas despite the lack of shared parental intent").

Thus, the Court cannot conclude that Ecuador is the location of the "family and social environment in which [James's] life has developed." *Gitter*, 396 F.3d at 134. Accordingly, the Court cannot find that James had become acclimatized to life in Ecuador "so complete[ly] that serious harm . . . can be expected to result" if James continues to live in the place of the parties' last mutual intent – i.e., the United States.[9]

## CONCLUSION

The Court is keenly aware of the human consequences of this dispute. Because Bonilla is currently barred from entering the United States legally, the dismissal of her petition may prevent her from seeing James unless Sinchi allows him to travel to Ecuador. In that regard, Sinchi stated under oath that he was willing to do so. *See* Tr. at 216:15-18 (Sinchi testifying that he had retained an attorney in Ecuador to "tell [Bonilla] that the child can go there twice a year and stay for two months."). There is a more formal mechanism through which Bonilla may secure custody and/or visitation rights, namely a proceeding in New York state court. *See Cantor v. Cohen*, 442 F.3d 196, 206 (4th Cir. 2006) ("The Convention does not prevent the Appellant from filing a claim for visitation in state court under the state's visitation law."). Once custody and visitation rights

---

[9]The only affirmative defense which Sinchi raised was the "well-settled" defense. Because the Court concludes that Bonilla has not established her affirmative case for return, the Court need not address this affirmative defense.

are established under New York law, they may be enforced under both state law and the Convention. *See* Hague Convention arts. 8 ("Any person . . . claiming that a child has been removed or retained in breach of custody rights may apply either to the Central Authority of the child's habitual residence or to the Central Authority of any other Contracting State for assistance in securing the return of the child."), 27 ("An application to make arrangements for organizing or securing the effective exercise of rights of access may be presented to the Central Authorities of the Contracting States in the same way as an application for the return of a child.").

Unlike a state court, however, this Court has no warrant to award Bonilla custody or visitation rights. Its only role is to determine James's habitual residence. Having determined that to be the United States, the Court must deny Bonilla's petition to return James to Ecuador.

**SO ORDERED.**

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
September 10, 2009